IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW NIXON, et al., | Case No. 25-cv-05688-CRB |
| Plaintiffs, | |
| v. | **ORDER DENYING MOTION TO COMPEL; GRANTING MOTION TO DISMISS; DENYING MOTION TO REMAND** |
| VEGAS.COM, LLC, | |
| Defendant. | |

Plaintiffs Matthew Nixon ("Nixon") and Markus Cohn ("Cohn") (collectively, "Plaintiffs") brought a class action complaint against Defendant Vegas.com, LLC in state court, which was subsequently removed to federal court. Plaintiffs filed suit alleging that Defendant's website for booking travel and entertainment used a pricing model where advertised costs would be marketed as low, with mandatory fees revealed shortly before the actual purchase. Plaintiffs claim Defendant's pricing model violates California consumer protection law. In response, Defendant filed a motion to compel arbitration or, in the alternative, to dismiss the complaint for a failure to state a claim. Agreeing with Defendant that the Court lacks equitable jurisdiction, Plaintiffs also filed a motion to remand their equitable claims to state court. The Court DENIES the motion to compel, GRANTS in part the motion to dismiss, and DENIES Plaintiffs' motion for remand.

## I.     BACKGROUND

### A.     Vegas.com

Defendant owns and operates Vegas.com, an online platform that sells hotel stays, show tickets, and other entertainment services primarily in Las Vegas, Nevada. FAC (dkt. 1-3) ¶ 24. Starting around May 2025, Defendant purportedly promoted artificially low

prices on its website during the early stages of an online transaction.  Id. ¶ 25.  The substantial, mandatory fees were only disclosed near the end of the checkout process.  Id. Such a pricing model is referred to as "drip pricing."  Id.

Further, Defendant allegedly designed Vegas.com to influence user purchases that otherwise may have not been made through tactics such as urgency messaging (adding a false sense of time pressure) and scarcity messaging (false pressure that products are limited in supply).  FAC ¶ 27.  Defendant displayed such messaging in a "prominent red color," while disclosure of mandatory fees was in smaller and lighter font than the surrounding text.  Id.  An example of Defendant's design strategy in the relevant period for hotel booking is included below:



Id. ¶ 34 (Figure 3).

When a consumer would select the "See our last available rooms" option, they would be taken to a hotel-specific booking page.  FAC ¶ 39.  On this page, the website still displayed discounts and pressure messaging in red font, with the addition of other,

previously undisclosed fees in gray text.  Id. ¶ 40.  For example, a daily resort fee is now

listed in the image below:



 Id. (Figure 4).

It is only at checkout that the total price would be unveiled, inclusive of all fees

now charged.  FAC ¶ 41.  These additional fees—in this case, a resort charge—were a

mandatory cost in every booking.  Id.¶ 42.  An example of the final checkout screen is

displayed below:

Id. ¶ 41 (Figure 5).

This pricing model was also present in other Vegas.com services. For example, for ticket purchases, the total price would not be shown until the checkout screen, where a service fee would appear for the first time. FAC ¶ 47. While the individual price per ticket would be listed, there would be no indication that the service fee also applied to each ticket. Id. ¶ 48. Only the subtotal would represent the cost with the sum of the service fees included. Id. Similar practices were used throughout Vegas.com. Id. ¶ 51.

**B.     Matthew Nixon**

On March 31, 2023, Nixon booked the Las Vegas Hilton for one night via Vegas.com. FAC ¶ 52. Because the advertised rate was $119.40 per night, Nixon alleges that he reasonably believed the rate reflected the full cost without taxes. Id. But the total charge amounted to $182.40 (a 40% increase from the base rate), due to $15.98 in taxes and fees and a $51.02 mandatory resort charge—both of which were not disclosed beforehand. Id. ¶ 53.

Nixon's email confirmation reflected the resort charge, which was due and payable

at the hotel upon check-in.  FAC ¶ 54 (Figure 11).  Indeed, when he checked in on April 17, 2023, Nixon was asked to pay the resort charge.  Id. ¶ 54.  He alleges he would "have likely decided not to proceed with the booking process and would not have ultimately purchase[d] the hotel stay."  Id.

### C.    Markus Cohn

On March 31, 2025, Cohn booked the Bellagio in Las Vegas for one night on Vegas.com.  FAC ¶ 55.  At the time, the advertised base rate was $209.00 per night.  Id. When Cohn proceeded with the purchase, he ended up being charged a total of $236.97 (a nearly 30% increase in base rate), inclusive of $29.97 in taxes and fees and a $62.36 resort charge that were not disclosed before.  Id. ¶ 56.  Like Nixon, he alleges he was misled into believing the cost would be much less than what he was charged.  Id.

In the same transaction, Cohn also bought two tickets to a Penn & Teller show, which were advertised at a base price of $192.96.  Id. ¶ 57.  But the total cost was $223.90, which included $30.94 of a mandatory ticket service fee and a $9.95 order processing fee that were not disclosed earlier.  Id. ¶ 58.

### D.    Arbitration Agreement

In order to complete his purchase, Cohn needed to click that he accepted Defendant's Terms of Use ("TOU"), which contained an arbitration agreement.  Eisenhart Decl. (dkt. 15-1) ¶¶ 4–5.  Cohn would have to select the orange "ADD PAYMENT INFO" button, which was below a message that stated: "By clicking on the 'Add Payment Info' button below, you acknowledge the following: You agree and accept the Vegas.com Terms & Conditions, Terms of Use, COVID-19 Terms, and Privacy Policy, as well as consent to receive promotional emails."  Id. ¶ 4.  An image of the message is included below:

By clicking on the "Add Payment Info" button below, you acknowledge the following: You agree and accept the Vegas.com Terms & Conditions, Terms of Use, COVID-19 Terms, and Privacy Policy, as well as consent to receive promotional emails. You can manage your email subscriptions at any time.

**ADD PAYMENT INFO**

Id. (Exhibit 1).

Cohn would also need to agree to the TOU again when he finished his purchase by clicking the orange "COMPLETE BOOKING" button. Eisenhart Decl. ¶ 5. This button was under a similar message as the "ADD PAYMENT INFO" button. Id. An image of this message is included below:

By clicking on the "Complete Booking" button below, you acknowledge the following: You agree and accept the Vegas.com Terms & Conditions, Terms of Use, and Privacy Policy. You understand that your credit card will be charged $498.97 by Vegas.com and/or our reservation partners.

**COMPLETE BOOKING**

Id. (Exhibit 2).

The TOU included a binding arbitration agreement that also contained a class waiver. Id. ¶ 8. The agreement covers "any and all disputes, controversies, disagreements, or claims arising in any way out of or relating in any way to" a consumer's "use of, or access to," Vegas.com as well as "any tickets or other items sold or purchased on or through" Vegas.com. Id. ¶ 10. The TOU was hyperlinked on both webpages with the buttons above as of March 31, 2025. Id. ¶ 12.

**E.    Notice of Violations**

On May 19, 2025, Plaintiffs served Defendant with notice of violations of the Consumer Legal Remedies Act ("CLRA"). FAC ¶ 88. On June 18, Defendant responded to Plaintiffs but did not provide restitution to Plaintiffs or their purported class members for fees paid with interest. ¶ 89.

### F.    Procedural History

Plaintiffs believed they were the victims of Defendant's alleged bait-and-switch pricing scheme and represent that they would have taken their business elsewhere had they known the true costs initially.  FAC ¶ 60.  Accordingly, Plaintiffs filed a class action in California state court, which was later removed to federal court on July 7, 2025.  See Notice of Removal (dkt. 1).

Plaintiffs brought suit for three causes of action.  Plaintiffs' first cause of action lies under the CLRA (Cal. Civ. Code §§ 1750, et seq.).  FAC ¶¶ 74–89.  The second cause of action arises under the Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200, et seq.).  Id. ¶¶ 90–103.  And the third cause of action is based on the False Advertising Law ("FAL") (Cal. Bus. & Prof. Code §§ 17500, et seq.).  Id. ¶¶ 104–109.  In addition to class certification, Plaintiffs seek restitution, attorneys' fees, pre- and post-judgment interest, damages under the CLRA, and any other proper relief.  FAC (Prayer for Relief).

Defendant then moved to compel arbitration and, in the alternative, to dismiss the complaint.  Mot. (dkt. 15).  Plaintiffs also moved to remand their equitable claims, conceding they did not allege an inadequate remedy at law.  See Mot. to Remand (dkt. 25).

## II.    LEGAL STANDARD

### A.    Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") provides that contractual arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 67–68 (2010).  Private agreements to arbitrate under the FAA are enforced according to their terms.  9 U.S.C. § 4.  Therefore, a party may petition a district court "for an order directing that such arbitration proceed in the manner provided for in such agreement."  Id.

"[T]here is no 'strong federal policy favoring enforcement of arbitration agreements.'  The federal policy is to treat arbitration agreements like other contracts."

Armstrong v. Michaels Stores, Inc., 59 F.4th 1011, 1014-15 (9th Cir. 2023) (citing Morgan v. Sundance, Inc., 596 U.S. 411 (2022)).  A party "cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  AT&T Technologies, Inc. Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (internal quotation marks omitted).  Under the FAA, in assessing the enforceability of a contractual arbitration provision, a district court's role is "limited to determining (1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue."  Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). If the answer to both inquiries is affirmative, then the FAA requires the court to enforce the agreement in accordance with its terms.  Id.  Courts "apply ordinary state-law principles that govern the formation of contracts."  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (citations omitted).  "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91 (2000).

### B.    Motion to Dismiss

Under Rule 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief may be granted.  The Court may base dismissal on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019) (cleaned up).  A complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (cleaned up).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a 12(b)(6) motion.  Id. (citing Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007)).

When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the

1    nonmoving party." <u>Usher v. City of Los Angeles</u>, 828 F.2d 556, 561 (9th Cir. 1987).

2    "[C]ourts must consider the complaint in its entirety, as well as other sources courts

3    ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

4    documents incorporated into the complaint by reference, and matters of which a court may

5    take judicial notice." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322

6    (2007).

### C.    Motion for Remand

7

8         A suit may be removed from state court to federal court only if the federal court

9    would have had subject matter jurisdiction over the case.  <u>See</u> 28 U.S.C. § 1441(a); <u>see</u>

10   <u>also</u> <u>Caterpillar Inc. v. Williams</u>, 482 U.S. 386, 392 (1987) ("Only state-court actions that

11   originally could have been filed in federal court may be removed to federal court by the

12   defendant.").  "If at any time before final judgment it appears that the district court lacks

13   subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).  The party

14   seeking removal bears the burden of establishing federal jurisdiction.  <u>See</u> <u>Provincial Gov't</u>

15   <u>of Marinduque v. Placer Dome, Inc.</u>, 582 F.3d 1083, 1087 (9th Cir. 2009); <u>see also</u> <u>Abrego</u>

16   <u>Abrego v. The Dow Chemical Co.</u>, 443 F.3d 676, 683-685 (9th Cir. 2006) ("[U]nder

17   CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent

18   of federal jurisdiction.").

## III.   DISCUSSION

19

20        Defendant brings a motion to compel arbitration against Cohn based on the

21   arbitration agreement in the TOU and a related motion to stay Nixon's case pending

22   arbitration.  Because the Court determines that there was a lack of contract formation, the

23   Court denies both motions.  Defendant also brings a motion to dismiss for a failure to state

24   claims against primarily Nixon.  The Court grants the motion, in part, as to Nixon's CLRA

25   claim and Plaintiffs' equitable claims.  Accordingly, the Court denies Plaintiffs' motion for

26   remand.

### A.    Motion to Compel Arbitration

27

28        Cohn argues that he did not assent to the TOU because Defendant did not give

9

United States District Court
Northern District of California

1    reasonably conspicuous notice and, therefore, no contract was ever formed. See Opp'n at

2    3. The Court will decide this issue rather than letting the arbitrator decide it. See Kum Tat

3    Ltd. v. Linden Ox Pasture, LLC, 845 F.3d 979, 983 (9th Cir. 2017) ("Although challenges

4    to the validity of a contract with an arbitration clause are to be decided by the arbitrator,

5    challenges to the very existence of the contract are, in general, properly directed to the

6    court.").

7         As the party seeking to compel arbitration, Defendant "bears the burden of proving

8    the existence of an agreement to arbitrate by a preponderance of the evidence." Norcia v.

9    Samsung Telecomms. Am., LLC, 845 F.3d 1279, 1283 (9th Cir. 2017) (internal citation

10   and quotation marks omitted). "Arbitration is a matter of contract." Knutson v. Sirius XM

11   Radio Inc., 771 F.3d 559, 565 (9th Cir. 2014) (internal quotation marks omitted). "[A]

12   party cannot be required to submit to arbitration any dispute which he has not agreed so to

13   submit." Id. at 565 (internal quotation marks omitted). "In determining whether the

14   parties have agreed to arbitrate a particular dispute, federal courts apply state-law

15   principles of contract formation." Berman v. Freedom Fin. Network, LLC, 30 F.4th 849,

16   856 (9th Cir. 2022). The parties here appear to agree that California law governs. See

17   Mot. at 5; Opp'n at 4.

18        Cohn argues that Defendant's website did not provide reasonably conspicuous

19   notice of the TOU or its arbitration provision. Opp'n at 4. Vegas.com purports to bind

20   users through a "sign-in wrap agreement." For this type of agreement, a website "provides

21   a link to terms of use and indicates that some action may bind the user but does not require

22   that the user actually review those terms." Chabolla v. ClassPass Inc., 129 F.4th 1147,

23   1154 (9th Cir. 2025). A sign-in agreement may be enforceable "based on an inquiry notice

24   theory only if: (1) the website provides reasonably conspicuous notice of the terms to

25   which the consumer will be bound; and (2) the consumer takes some action, such as

26   clicking a button or checking a box, that unambiguously manifests his or her assent to

27   those terms." Id. at 1154–54. Cohn primarily bases his argument on the fact that notice

28   was not reasonably conspicuous. See Opp'n at 3. The Court agrees.

United States District Court
Northern District of California

### 1. Reasonably Conspicuous Notice of Terms

"To be conspicuous, [the] notice 'must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" Keebaugh v. Warner Bros. Ent. Inc., 100 F.4th 1005, 1014 (quoting Berman, 30 F.4th at 856). The "context of the transaction," as well as the "traditional inquiry related to the visuals involved with the notice, such as font size, text placement, and overall screen design," inform whether a website provides reasonably conspicuous notice of the terms of an agreement. Id. at 1019 (citing Oberstein v. Live Nation Ent. Inc., 60 F.4th 505, 516 (9th Cir. 2023); B.D. v. Blizzard Ent., Inc., 76 Cal.App.5th 931, 292 Cal. Rptr. 3d 47, 62 (2022); Sellers v. JustAnswer LLC, 73 Cal. App. 5th 444, 289 Cal. Rptr. 3d 1, 26 (2021)). The nature of the service or goods offered and the visual aspects of every page of a multi-page transaction should be considered together. See Oberstein, 60 F.4th at 515–16 ("[T]he inquiry has always been context-and fact-specific." (quotation marks omitted)); Sellers, 289 Cal. Rptr. 3d at 26–28.

### a. Context of the Transaction

The nature of an agreement may anticipate "some sort of continuing relationship . . . that would require some terms and conditions[.]" Sellers, 289 Cal. Rptr. 3d at 26 (emphasis omitted); see Keebaugh, 100 F.4th at 1019. A user should expect that certain relationships are bound by terms, even if not explicitly told. See Keebaugh, 100 F.4th at 1020 (users who download and play a mobile game that includes in-app purchases should expect a continuing relationship with the developer governed by terms of use); Oberstein, 60 F.4th at 517 (users who make an account with a ticket purchasing website through a "full registration process" should expect "'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship."). Conversely, when a user simply purchases goods or avails themselves of a one-time discount offer, there is less reason for them to expect a continued relationship beyond the purchase. Sellers, 289 Cal. Rptr. 3d at 25.

Here, the "context of the transaction" likely did not put Cohn "on notice for a link

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    to the terms of that continuing relationship." Oberstein, 60 F.4th at 517. Because Cohn

2    just made a one-time booking for a hotel stay along with two tickets, his relationship with

3    Vegas.com did not go beyond his purchase. Indeed, he did not make an account or register

4    with Vegas.com in any way that would support a continuing relationship. See Opp'n at 4.

5    Defendant argues that Cohn's purchase was not a quick, one-off transaction because Cohn

6    admits to visiting Vegas.com many times before his purchase. Reply (dkt. 34) at 2. But

7    Cohn's past visits to the website before making his transaction does not change the fact

8    that his relationship with Vegas.com "did not contemplate any future purchases that would

9    be bound by terms." Lee v. Plex, Inc., 773 F. Supp. 3d 755, 765–66 (N.D. Cal. 2025)

10   (emphasis added). Accordingly, the Court finds that the context of Cohn's relationship

11   with Defendant "did not put him on notice to look for additional terms." Id. at 766.

### b.    Visual Aspects of Vegas.com

13   "Website users are entitled to assume that important provisions—such as those that

14   disclose the existence of proposed contractual terms—will be prominently displayed, not

15   buried in fine print." Berman, 30 F.4th at 857. "While terms may be disclosed through

16   hyperlinks, the presence of a hyperlink 'must be readily apparent,' and '[s]imply

17   underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent

18   user that a clickable link exists.'" Keebaugh, 100 F.4th at 1014 (quoting Berman, 30 F.4th

19   at 857) (alteration in original). Courts look to "'the conspicuousness and placement of the

20   Terms of Use hyperlink, other notices given to users of the terms of use, and the website's

21   general design' in determining 'whether a reasonably prudent user would have inquiry

22   notice of a [sign-in wrap] agreement.'" Oberstein, 60 F.4th at 515 (quoting Nguyen v.

23   Barnes & Noble Inc., 763 F.3d 1171, 1177 (9th Cir. 2014)); see Keebaugh, 100 F.4th at

24   1020–21 (applying Berman and Oberstein to a sign-in wrap agreement).

25       For a hyperlink to be reasonably conspicuous, it must be denoted by design

26   elements tailored to notify the reasonably prudent internet user of its presence. The use of

27   a different colored font can be reasonably conspicuous. See also Mahram v. Kroger, 104

28   Cal. App. 5th 303, 324 Cal. Rptr. 3d 575, 577 (2024) (finding that terms noted by green

1    text were sufficiently conspicuous). But there is no bright-line test for finding that a

2    particular design element is adequate in every circumstance. Instead, the Court must

3    consider how those design elements appear on the page. See, e.g., Berman, 30 F.4th at 857

4    (finding "the textual notice is further deemphasized by the overall design of the webpage,

5    in which other visual elements draw the user's attention away from the barely readable

6    critical text.").

7         The Court finds that the notice on the "ADD PAYMENT INFO" and "COMPLETE

8    BOOKING" pages are not reasonably conspicuous.[1] Defendant's notice does have a few

9    details in its favor: the notice is above the button that manifests assent when clicked, the

10   font color is different (light purple), and the first letters of the agreements are capitalized.

11   See Reply at 3. But the overall design demonstrates that the notice was insufficient to

12   render the hyperlinks reasonably conspicuous.

13        For starters, the different colored font—arguably the detail most in Defendant's

14   favor—is a very faint purple, almost light lavender. When the Court first looked at the

15   notice, it missed the different color entirely, especially because the gray background makes

16   it difficult to notice the contrast. Of course, once the Court knew what to look for, it could

17   readily make out the distinction. That the hyperlink is not "blue, the color typically used to

18   signify the presence of a hyperlink," underscores the issue.[2] See Berman, 30 F.4th at 854.

19   Moreover, the hyperlinks are not underlined or bolded to emphasize the presence of a link.

20        Defendant's resort to case law on conspicuous links is unavailing. For example,

21   Defendant points to Keebaugh and asserts that the court approved of "white hyperlinks at

22   the bottom of a webpage . . . where the notice itself was also white." Reply at 2–3. While

23   that is technically correct, the images at issue show a different picture. The Court agrees

24   that the font for the notice (white) was the same as the text generally. But the hyperlinks

25   were placed on a black background within white boxes that emphasized the clickability of

26

27   _____

[1] As both notices were functionally the same, the Court will evaluate them together.

28   [2] Cohn represents that Defendant's new page design now uses blue hyperlinks against a white background. Opp'n at 5.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

the links.  See Keebaugh, 100 F.4th at 1010–11.  Similarly, Defendant's reliance on

Massel v. Successfulmatch.com is misplaced.  Defendant argues that Massel even

validated hyperlinks that were not in a contrasting font color.  Reply at 2–3.  True enough.

But the notice in Massel, in contrast to the one here, was explicitly underlined to provide

conspicuous notice of the hyperlinks.  Massel v. Successfulmatch.com, 2025 WL 2452371,

at *1 (9th Cir. Aug. 26, 2025).

The design of the rest of the page is also crowded enough to render notice

insufficient.  As Cohn notes, the font for the hyperlinks (and surrounding agreement

message) is 12.5% smaller than the other text on the webpage, a point Defendant does not

appear to address.  Reply at 5.  When viewed in light of the whole page, the hyperlinks and

agreement message are overshadowed.  The other messages are in larger font, with many

words listed in all caps—even bolded font.  Notably, messages such as "IMPORTANT

INFORMATION" are surrounded by green text boxes for additional emphasis.  The only

substantive information, aside from the orange button, relegated to the gray background

are the hyperlinks and agreement message.  An example of the full webpage is included

below:

Eisenhart Decl., Ex. 1.

Accordingly, the Court finds that the overall design of the visual elements renders the notice insufficient for reasonable conspicuousness. The "lack of notice is dispositive," so the Court does not go any further in its analysis. See Lee, 773 F.Supp.3d at 766. The Court denies the motion to compel arbitration.[3]

**B.     Motion to Dismiss**

Defendant makes four arguments on its motion to dismiss: (1) Cohn failed to

_____

[3] Because the motion to compel arbitration is denied, the Court denies Defendant's request to stay Nixon's claims pending arbitration, too.

15

1   engage in informal dispute resolution per the TOU's terms, (2) Nixon fails to allege a

2   CLRA violation, (3) Nixon fails to allege reasonable reliance, which is a necessary

3   element of all his claims, and (4) Plaintiffs fail to state a damages claim under the CLRA.

4   Mot at 11–12.  As discussed regarding the motion to compel arbitration, there was no valid

5   contract formed regarding Cohn and the TOU, so Cohn cannot be bound by an informal

6   dispute resolution clause that was part of the TOU itself.  Consequently, the Court only

7   addresses the remaining three arguments.

### 1.    Nixon's Failure to Allege a CLRA Violation

9        Defendant argues that Nixon cannot state a claim for a CLRA violation because

10  "drip pricing," banned by Cal. Civ. Code § 1770(a)(29), was only added to the statute in

11  July 1, 2024, after Nixon made his March 31, 2023 purchase.  Mot. at 13.  As this Court

12  noted in May of this year: "In July 2024, after national attention came to Ticketmaster's

13  practice of charging exorbitant 'service fees' for in-demand live events, the California

14  Legislature passed the 'Honest Pricing Law,' which amended the CLRA to ban a practice

15  known as 'drip pricing.'"  Harvey v. World Mkt., LLC, No. 25-CV-01242-CRB, 2025 WL

16  1359066, at *1 (N.D. Cal. May 9, 2025).  Accordingly, because nothing in the statute says

17  the law is to be applied retroactively, Defendant asserts Nixon's CLRA claim necessarily

18  fails at the gate.  Mot. at 13.

19       Nixon attempts to pivot by arguing that Section 1770(a)(9) of the CLRA also covers

20  the alleged misconduct.  Section 1770(a)(9) covers the "[a]dvertising of goods or services

21  with intent not to sell them as advertised."  Cal. Civ. Code § 1770(a)(9).  Section

22  1770(a)(29) refers to the "[a]dvertising, displaying, or offering a price for a good or service

23  that does not include all mandatory fees or charges" other than a couple exceptions, such

24  as government taxes.  Cal. Civ. Code § 1770(a)(29).  In Nixon's view, Section 1770(a)(29)

25  broadens Section 1770(a)(9), instead of supplanting it.  Opp'n at 18.  The Court disagrees.

26  While Nixon is correct that Section 1770(a)(29) omits intent, the proscribed conduct—not

27  belatedly including mandatory fees—is much narrower and specific than Section

28  1770(a)(9), which merely prohibits vendors from not selling goods or services as

United States District Court
Northern District of California

advertised.  It makes little sense to assume the California Legislature passed a law to prohibit conduct that was already substantively covered within the same statute.  See Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 528 (1959) ("We cannot assume that state legislative enactments were adopted arbitrarily or without good reason to further some legitimate policy of the State.").

To escape this conclusion, Nixon points to Hall v. Marriott International, Inc., which he asserts recognized that advertising hotel rooms and tickets without the eventual price fits under Section 1770(a)(9).  Opp'n at 18 (citing Hall v. Marriott Int'l, Inc., 2020 WL 4727069, at *12 (S.D. Cal. Aug. 14, 2020) (hotel rooms can be goods or services under the CLRA)).  But Defendant notes that the same court—prior to the Honest Pricing Law's enactment—later rejected the idea that advertising the non-final price violated the CLRA.  Reply at 13 (citing Hall v. Marriott Int'l, Inc., 2020 WL 4727069, at *12 (S.D. Cal. Aug. 14, 2020) ("Plaintiffs' bait and switch theory of deception fails as a matter of law.")).  Lastly, Nixon points to the Honest Pricing Law's preamble, which said drip pricing is "prohibited by existing statutes, including the [UCL] and [FAL]."  2023 Cal. Stat. ch. 400.  While that may or may not be true, it has nothing to do with the CLRA, which the Honest Pricing Law sought to amend.

Because Section 1770(a)(29) post-dates the conduct alleged, the Court dismisses Nixon's CLRA claim.

### 2.    Nixon's Reasonable Reliance

Defendant argues that Nixon fails to show reasonable reliance on Defendant's alleged misrepresentations because the "fees and taxes for the hotels and tickets at issue" were fully disclosed prior to purchase.  See Mot. at 13–14.  Since reliance is an essential element under the UCL and FAL, Defendants contend that Nixon's UCL and FAL claims fail.  Mot. at 14 (citing Morizur v. Seaworld Parks & Ent., Inc., No. 15-CV-02172-JSW, 2020 WL 6044043, at *17 (N.D. Cal. Oct. 13, 2020) ("[R]eliance is an essential element of a plaintiff's statutory standing to sue under the UCL, FAL, and CLRA.")).  Nixon counters that plaintiffs don't need to prove actual reliance at the pleading stage.  Opp'n at 18.

United States District Court
Northern District of California

Instead, a complaint need only allege facts showing that a reasonable consumer "would attach importance to [the] existence or nonexistence [of the misrepresentation] in determining" their choice for the relevant transaction. Id. (quoting Moore v. Mars Petcare US, Inc., 966 F.3d 1007, 1021 (9th Cir. 2020)). The Court agrees with Nixon.

Reliance "can be presumed, or at least inferred, when the [misrepresentation] is material." Daniel v. Ford Motor Co., 806 F.3d 1217, 1225 (9th Cir. 2015). And Nixon has sufficiently alleged he is entitled to an inference of reliance. He clearly alleges he believed that the cost of his room, aside from taxes, was encompassed by the $119.40 advertised price. FAC ¶ 52. Nixon also alleges he "relied on the falsely advertised prices that excluded mandatory fees and charges" and, had he known the truth, "would have behaved differently, potentially by doing business elsewhere." Id. ¶ 101. These allegations are sufficient to allege materiality, meaning they are enough to show reliance. If Defendant wishes to challenge the presumption of reliance, "that dispute presents a factual question inappropriate for resolution at this juncture." Mansfield v. StockX LLC, No. 25-CV-04250-RFL, 2025 WL 2811791, at *7 (N.D. Cal. Oct. 3, 2025).

Other recent drip pricing cases in this District are in accord. In Mansfield, the court rejected the defendant's contention that reliance was not alleged because the "allegedly missing information" was revealed "later in the sales process." Id. at *6. Instead, the court noted that "reliance must be evaluated at the moment of the initial omission, i.e., when the consumer views the initial price communication, and not later upon eventual disclosure of the true price." Id. Accordingly, it was enough that the "failure to disclose the true price at the initial phase of the shopping experience disincentivized [the plaintiff] from shopping around at rival retailers." Id.

Similarly, the court in Chowning v. Tyler Technologies, Inc. was evaluating another case where plaintiffs had brought a drip pricing action under the CLRA, UCL, and FAL. 25-CV-4009-YGR, 2025 WL 3496690, at *3 (N.D. Cal. Dec. 5, 2025). The Court reasoned that all three statutes "have similar causation requirements." Id. Relying on this Court's decision in Harvey, the Chowning court determined that allegations of reliance on

18

1  an advertised price to continue a transaction were sufficient, since the plaintiffs may have

2  opted to transact differently had they known the truth.  Id.

3        Consequently, this Court finds that Nixon has made a sufficient showing of reliance

4  for his UCL and FAL claims.  The Court denies Defendant's motion to dismiss as to

5  Nixon's UCL and FAL claims on this basis.

6              **3.        Damages Claim under the CLRA**

7        Lastly, Defendant asserts that Plaintiffs' CLRA claim for damages is barred since

8  Defendant took corrective action within 30 days of Plaintiffs' notice.  Mot. at 14–15.  As

9  this Court dismisses Nixon's CLRA claims, it only considers this argument for Cohn's

10  CLRA claim.  Defendant argues that its efforts to eliminate the challenged practices—even

11  before Plaintiffs' notice—suffice as corrective measures.  Id. at 15.  Cohn responds by

12  arguing that mere cessation of challenged conduct is not enough; making the injured whole

13  is what counts.  Opp'n at 19.  The Court agrees with Cohn.

14        Before a prospective litigant can file an action, Section 1782 requires them to

15  provide 30-day's notice to a potential defendant of the alleged violations in order to give

16  them the opportunity to correct or repair the harm.  Cal. Civ. Code § 1782(a).  If corrective

17  measures take place within 30 days of receiving the notice, the prospective litigant is

18  barred from seeking damages.  Cal. Civ. Code § 1782(b).  The corrective action must be

19  "given" to the prospective litigant and be deemed "an appropriate correction, repair,

20  replacement, or other remedy."  Id.  "The clear intent of the act is to provide and facilitate

21  precomplaint settlements of consumer actions wherever possible and to establish a limited

22  period during which such settlement may be accomplished."  Benson v. S. California Auto

23  Sales, Inc., 239 Cal. App. 4th 1198, 1206, 192 Cal. Rptr. 3d 67, 72 (2015).  And the

24  "appropriateness of a correction offer under the CLRA should be left to the trial court's

25  discretion."  Id. at 1208.

26        Defendant's corrective action to remove the challenged conduct was insufficient to

27  bar Cohn's claim for CLRA damages.  While the Court appreciates and recognizes

28  Defendant's conduct, Section 1782 plainly requires more.  To be appropriate, the

United States District Court
Northern District of California

19

United States District Court
Northern District of California

corrective action must have been "given" to Cohn. Cal. Civ. Code § 1782(b). Cessation of challenged conduct cannot reasonably be considered as "given," when it does nothing to redress <u>Cohn's</u> purported injury. Indeed, barring money damages only makes sense if the corrective action also has some monetary value to the litigant. Otherwise, litigants could potentially double-dip by benefiting from corrective action <u>in addition</u> to damages.

The statutory framework and case law support the Court's conclusion that cessation of conduct alone may be insufficient. Section 1782(c), which bars damages for class actions if corrective action was made, explicitly contemplates correction or remedy <u>to the individual consumer</u>. Cal. Civ. Code § 1782(c). Moreover, in <u>Benson</u>, the court affirmed as "appropriate" a corrective action that was a settlement for $34,500. <u>Benson</u>, 239 Cal. App. 4th at 1211. Cohn also points to <u>Kagan v. Gibraltar Savings & Loan Association</u>, where the court concluded that, had the defendant reimbursed the plaintiffs for the amount they requested, the defendant could have satisfied its corrective obligation under Section 1782. 35 Cal. 3d 582, 595, 676 P.2d 1060 (1984), <u>overruled on other grounds by</u> <u>Meyer v. Sprint Spectrum L.P.</u>, 45 Cal. 4th 634, 200 P.3d 295 (2009). Defendant's citation to <u>DeNike v. Mathew Enterprise, Inc.</u> further undermines its position. In that case, the court held that an offer to repair a vehicle or rescind a purchase agreement along with a full refund and reimbursement constituted appropriate corrective action to bar a damages action. <u>DeNike v. Mathew Enter., Inc.</u>, 76 Cal. App. 5th 371, 381, 291 Cal. Rptr. 3d 480, 489 (2022).

The Court rejects Defendant's argument that Cohn has failed to state a claim for damages under the CLRA.

## C.    Motion for Remand

Plaintiffs urge this Court to partially remand their equitable claims under the UCL, FAL, and CLRA. Reply ISO Remand (dkt. 30) at 4–7. Defendant contends that Plaintiffs' motion should be denied—and the claims should be dismissed—because partial remand of

1   equitable claims under Section 1447(c) is not permissible.[4]  Opp'n to Remand at 2–3; Mot.

2   at 15.  Given the current lack of guidance from the Ninth Circuit, the Court agrees with

3   Defendant that it is at least unclear if the Court has the ability to partially remand

4   Plaintiffs' equitable claims.

5          Plaintiffs concede this Court does not have equitable jurisdiction over their

6   equitable claims under the UCL, FAL and CLRA.  Mot. to Remand at 3.  Equitable

7   jurisdiction is a limitation on federal courts that asks if a "court may exercise its remedial

8   powers" consistent with the principles of equitable relief.  See Schlesinger v. Councilman,

9   420 U.S. 738, 754 (1975).  Although equitable jurisdiction is distinct from subject matter

10  jurisdiction, both are "antecedent to hearing a claim on the merits."  Guthrie v.

11  Transamerica Life Ins. Co., 561 F. Supp. 3d 869, 874 (N.D. Cal. 2021).  Therefore,

12  whenever a federal court is presented with an equitable claim, it must first determine

13  whether it possesses equitable jurisdiction before it can address the merits.  See Guzman v.

14  Polaris Indus., 49 F.4th 1308, 1314 (9th Cir. 2022).

15         The UCL, FAL, and CLRA all allow for both equitable relief

16  (restitution/injunction) and monetary relief.  Bus. & Prof. Code §§ 17200, et seq.; Bus. &

17  Prof. Code §§ 17500, et seq.; Civil Code §§ 1780(a), 1780(e).  But federal common law

18  only permits equitable relief when there is no adequate remedy at law.  Sonner v. Premier

19  Nutrition Corp., 971 F.3d 834, 839–40 (9th Cir. 2020).  In Sonner, the Ninth Circuit held

20  that traditional equitable principles derived from federal common law apply to UCL

21  restitution claims.  See id.  In particular, Sonner held that a federal court in a diversity

22  action does not have equitable jurisdiction to award restitution to a party under the UCL

23

24  ---
    [4] Defendant also argues that Plaintiffs' motion is untimely since it was filed nearly two weeks

25  after the 30-day statutory deadline for 28 U.S.C § 1447(c).  Opp'n to Remand at 2.  But the Ninth
    Circuit has established that non-statutory grounds for remand, such as for lack of equitable

26  jurisdiction, do not fall under Section 1447.  Ruiz v. Bradford Exch., Ltd., 153 F.4th 907, 913 (9th
    Cir. 2025) (lack of equitable jurisdiction provides grounds for remand not under Section 1447).

27  Remand on non-statutory grounds merely needs to be filed without reasonable delay.  Kamm v.
    ITEX Corp., 568 F.3d 752, 757 (9th Cir. 2009).  Because Plaintiffs moved just 42 days after

28  removal, the Court does not find that this was an unreasonable delay.  See id. (motion for remand
    brought 31 days after removal was reasonable).

1  unless that party first establishes they lack an adequate remedy at law. See id. at 844.

2  Importantly, courts in this Circuit have extended the reasoning in Sonner regarding the

3  inadequate remedy at law requirement to claims removed from state court. See, e.g., Slick

4  v. CableCom, LLC, 2022 WL 4181003, at *1, 3 (N.D. Cal. Sept. 12, 2022).  Therefore,

5  because Plaintiffs fail to allege they lack an adequate remedy at law, the Court does not

6  have equitable jurisdiction over Plaintiffs' equitable claims under the UCL, FAL, and

7  CLRA.

8      When a case is originally filed in federal court and the court does not have equitable

9  jurisdiction, it is permissible for the court to dismiss the equitable claims without

10  prejudice. Guzman, 49 F.4th at 1314.  The Ninth Circuit has applied this principle to

11  removed cases, too: "when a case is removed from state court and the district court

12  concludes it lacks equitable jurisdiction, the court has the authority to remand the case to

13  state court." Ruiz, 153 F.4th at 913. Ruiz, however, involved a court lacking equitable

14  jurisdiction over every claim, and so the entire case was remanded. Id. at 912.  In contrast,

15  Plaintiffs seek partial remand.  Mot. for Remand at 1.  Accordingly, it is unclear if the

16  Court can partially remand Plaintiffs' equitable claims at all.

17      Instead, the Court dismisses Plaintiffs' equitable claims without prejudice, so they

18  can be brought appropriately in state court.  Plaintiffs' concerns about the preservation of

19  their rights are also unwarranted.  Mot. to Remand at 5 (potential statute-of-limitations

20  issues if not remanded).  Their equitable claims are not currently threatened by any

21  applicable statutes of limitations.  Plaintiffs allege the first violation occurred in March

22  2023.  FAC ¶¶ 10–11.  The statutes of limitations for the UCL, FAL, and CLRA are,

23  respectively, four years, three years, and three years from the date of the violation.  Bus. &

24  Prof. Code §§ 17200, et seq.; Bus. & Prof. Code §§ 17500, et seq.; Civil Code §§ 1780(a),

25  1780(e).  Consequently, Plaintiffs have until March 2026 to refile in state court.

26      The Court denies Plaintiffs' motion to partially remand.

27  **IV.    CONCLUSION**

28      For the foregoing reasons, the Court **DENIES** Defendant's motion to compel

United States District Court
Northern District of California

arbitration, **GRANTS** in part Defendant's motion to dismiss as to Nixon's CLRA claim, and **DENIES** Plaintiffs' motion for remand.

   **IT IS SO ORDERED.**

  Dated: December 23, 2025

            CHARLES R. BREYER
            United States District Judge

United States District Court
Northern District of California